AJEM LABORATORIES, INC., a Michigan corporation, and Centri-Spray Corporation, a Michigan corporation, Plaintiffs,

v.

C. M. LADD CO., Inc., a Michigan corporation, and Charles M. Ladd, Defendants and Third Party Plaintiffs,

v.

WILSON AUTOMATION COMPANY, a Michigan corporation, Third Party Defendant.

Civ. A. No. 27057.

United States District Court
E. D. Michigan, S. D.

Jan. 17, 1969.

Abe A. Schmier, of Schmier & Schmier, Detroit, Mich., and John A. Mitchell, of Curtis, Morris & Safford, New York City, for plaintiffs.

Julius Denenberg, of Head & Denenberg, Detroit, Mich., and Benjamin W. Colman, Southfield, Mich., for defendants and third-party plaintiffs.

William H. Griffith, of Whittemore, Hulbert & Belknap, Detroit, Mich., Adolph G. Martin, Dearborn, Mich., for Wilson Automation Co., third-party defendant.

FINDINGS OF FACT
AND
CONCLUSIONS OF LAW

MACHROWICZ, District Judge.

(1) This is an action for patent infringement filed by Plaintiff corporations, Ajem Laboratories, Inc. (Ajem) and Centri-Spray Corporation (Centri-Spray), organized and existing under the laws of the State of Michigan, and having their principal offices and place of business in Livonia, Michigan, within the jurisdiction of this Court.

(2) Defendants are a corporation, C. M. Ladd Co., Inc., organized and existing under the laws of the State of Michigan and having its principal office and place of business in Troy, Michigan, and the individual Charles M. Ladd, residing in Redford Township, within the jurisdiction of this Court.

(3) For the purposes of this litigation, Plaintiff Ajem is the recorded owner of Umbricht et al United States Letters Patent No. 2,979,062, and Plaintiff Centri-Spray is the exclusive licensee of Ajem under this patent.

(4) Title 35 United States Code Section 102(b) provides that a patent shall not issue if the "invention was" "on sale in this country" before the critical date

of the application. The identification of the "invention" is found, upon reference to 35 U.S.C. § 112, in the specification and claims of both the application for and the patent in suit, which were placed in evidence. In addition, the Court had available to it the original disclosure of the applicants upon which Plaintiff's counsel based the application for Letters Patent.

(5) The application for the patent in suit was filed on November 9, 1954, and the critical date therefor is November 9, 1953.

(6) Upon motion of Defendants, a separate trial of the "on sale" issue under 35 U.S.C. § 102(b) was held on July 16–19, 1968 and primarily dealt with defendant's contention that the patent in suit was invalid because the invention of each claim was allegedly "on sale" more than one year before the application, which resulted in this patent, was filed in the Patent Office.

(7) The disclosure, prepared by an officer of the Plaintiff Ajem experienced for 22 years in patent matters before his employment by the Plaintiffs, described and defined the invention as follows:

*"The heart of these new improved washing devices* for engine heads and similar fabricated castings or steel parts *is found in the central units composed of the turrets, the indexing device, and the accompanying arrangement of nozzles."* (Emphasis added) (Arnold Disclosure, Ex. P., p. 41)

"In this newly designed washer *the primary invention is concerned with the indexing and transfer of the part to position the castings for separate* wash, rinse and drying operations. * * * It will be noted that there are two main motions to actuate and control. *One is the transfer of the head along the track and the other is the indexing of the rotating mechanism."* (Emphasis added) (Arnold Disclosure, Ex. P, p. 47)

This definition of applicants in their disclosure was used and followed by counsel in the preparation of the application for the patent in suit.

(8) The invention described in the patent specification involves a horizontal shuttle-bar transfer mechanism having an intersected sectional track for slidingly moving parts to be cleaned horizontally through the washer, and rotary turrets disposed transversely of the track and in the open spaces between the track sections for receiving the parts from the track, carrying them through a full 360° revolution of the turrets, while spray nozzles direct jets of washing liquid or drying air to the parts, and discharging the parts back onto the track.

(9) During the initial prosecution of the application, Claim 1 as filed, together with other apparatus claims, were materially limited in amendments filed by the Plaintiffs, to avoid prior art patent references cited by the Examiner and to obtain the allowance of claims. These amendments applied limitations to the definition of the horizontal transfer mechanism so that the apparatus claims were directed and read specifically to a horizontal "shuttle-bar" transfer device having an intersected sectional track.

(10) The file wrapper of the patent in suit reveals that early in the prosecution of the application, Plaintiffs were required to elect between their apparatus claims and three method claims, as filed, before the Patent Office would act upon the merits of the application. To meet this requirement, Plaintiffs elected the apparatus claims, and the non-elected method claims were thereupon restricted from prosecution. (Method Claims 6, 7 and 8 were later abandoned upon the submission of new apparatus Claims 24 and 25 [patent Claims 4 and 16] by amendments filed February 3 and April 25, 1960.)

(11) Defendants established by substantial evidence, which Plaintiffs did not negate or overcome, that Plaintiff Centri-Spray, prior to the critical date, November 9, 1953, issued six (6) offers for sale or proposals for machines which embodied the invention defined in the Arnold Disclosure (Ex. P), in Claim 1 of

the application as filed, in Claim 1 of the patent as issued, and in the originally-filed Method Claims 6, 7 and 8, upon which Plaintiffs later, in 1960, purportedly based their amendment claims which issued as patent Claims 4 and 16.

(12) The Ford of Canada machine offered for sale in August 1952, more than two years prior to the filing date of the application for the patent in suit, and represented by Plaintiff at the trial to be substantially according to the demonstration model, Exhibit 7, was ordered by Ford of Canada, constructed by Plaintiff Centri-Spray, shop-tested, approved by the customer, invoiced by Centri-Spray, paid for in full, and shipped to the customer before the critical date. The machines sold to Pontiac Motor Division and McKinnon Industries, Ltd. were proposed by Plaintiff Centri-Spray and ordered by these customers well before the critical date. In accordance with such contracts of sale, Plaintiff Centri-Spray proceeded to fabricate these machines and to embody therein the invention defined in the disclosure, the application and the claims of the issued patent.

(13) Each of the offers and proposals for the sale of turret-type washing machines embodying the invention to Ford Motor Company-Highland Park, Ford Motor Company-Cleveland, and Chevrolet Manufacturing Division were made prior to the critical date, even though the purchase orders for the last two proposals were issued after the critical date and the machines were fabricated and shipped in due course.

(14) Plaintiff Centri-Spray offered these machines for sale in accordance with their regular promotional and competitive business practices and in the ordinary course of their business. At least the first of these washers, to Ford of Canada, was used in Plaintiff's promotional sales efforts and shown to its prospective customers. The company's officers and sales representatives, in sales promotional discussions with their customers, imposed no obligation of secrecy or confidence, nor any restriction

upon their disclosures regarding the nature of the washer construction that Centri-Spray was offering for sale and later built for them. These offers and sales were made and entered into solely for Plaintiffs' profit, to provide their customers with required washing equipment. The sales were undertaken and made in an atmosphere of competitive activity.

(15) Substantial evidence was presented and the Court finds that none of the machines charged by Defendants to violate Section 102(b) were offered for sale as "experimental" machines by Plaintiff Centri-Spray. No requirement was imposed by Plaintiff that the purchased machines be kept secret or in confidence, nor was any requirement made upon the customers that they submit to Plaintiffs regular or any test reports upon the functional operation, efficiency or inefficiency of the machines procured from Centri-Spray.

(16) The customers of Plaintiff Centri-Spray did not understand nor consider these machines to be "experimental" machines in any sense when they were ordered. They procured them for production use, as regular production equipment.

(17) The facts establish that Plaintiff Centri-Spray itself did not consider nor treat the machines as either "experimental" or "developmental." Plaintiffs did not request nor make any record of testing, and neither its own employees nor its customers' employees, or for that matter anyone else, kept or maintained any control record of the operational effectiveness of any of these washing machines offered for sale and sold before the critical date.

(18) Plaintiff Centri-Spray offered each of these machines as a completely designed and operable piece of production equipment, ready when delivered to be installed and operated for production use at the plants of its customers. It appears from the evidence that at least two of these very earliest (1953) machines are still in operation today, a period of more than 15 years.

(19) It clearly appears that any problems associated with the start-up and initial operation of these machines were merely matters of adjustment after installation, rather than material changes in the nature or construction of the washers.

(20) Plaintiffs asserted Claims 4 and 16 of the patent in suit against Defendants. These claims were filed as new apparatus claims by amendments more than five years after the filing date of the application, on February 3 and April 25, 1960. These new apparatus claims contained a definition of the horizontal transfer mechanism which read simply "transfer means." This definition was conceded by Plaintiffs' counsel at the trial to be an enlargement over the definition for such element in the apparatus claims previously limited by Plaintiffs to a "shuttle-bar" transfer device, in their earlier prosecution of the application.

(21) This attempt to enlarge the claim coverage followed the acquisition by Plaintiff Centri-Spray of an order from the Oldsmobile Division for two turret-type washers requiring a "walking beam" transfer mechanism. This order was acquired in November 1959 upon offers for sale submitted by Plaintiff Centri-Spray in October. The washers were in fabrication at the time the first amendment was filed on February 3, 1960. The second amendment was filed shortly after shipment and delivery of the washers to Oldsmobile.

(22) Plaintiffs obtained the entry of the amendments, whereby Claims 4 and 16 were issued in the patent, only after interviews by associate counsel with the Examiner in the Patent Office. These interviews were held following the termination of prosecution of the originally-filed claims, and following Plaintiff's receipt of Oldsmobile's order for the two "walking beam" washers.

(23) The critical dates of patent Claims 4 and 16 asserted against Defendants are February 3 and April 25, 1959. Prior to these critical dates, Plaintiff Centri-Spray admittedly sold machines coming within the definition of invention defined in these asserted claims.

(24) Plaintiffs were well aware of and fully informed concerning their proposals for and sales of these washing machines to the Ford Motor Company of Canada, Ltd., Pontiac Motor Division, McKinnon Industries, Ltd., Ford Motor Company-Highland Park, Ford Motor-Cleveland Engine Plant, and the Chevrolet Manufacturing Division, before the disclosure of the invention was made to counsel for the preparation of the application that resulted in the patent in suit. Photographs of significant and vital portions of the first machine to Ford of Canada, illustrating the invention, were included with the disclosure of applicants to counsel. The disclosure appears to have been drawn, so far as the significant elements of the invention are concerned, as if no distinction was made by Plaintiffs between the Ford of Canada machine and any of the other machines, including the Chevrolet machine, later fabricated and shipped and upon which Plaintiffs claim to have based their application for the patent in suit.

(25) The Court finds that Plaintiffs did not fulfill their obligation of a full, frank and truthful disclosure of the facts relating to the washing machines offered for sale and sold before the critical date of the application and of the washers sold in 1959, upon which they attempted to obtain enlarged claim coverage by their filing of new apparatus Claims 4 and 16.

(26) The Plaintiffs, by failing to meet this obligation in their prosecution of the application for patent, did not exercise that candor and good faith required of applicants standing before the Patent Office.

(27) Defendants met and maintained their burden of proof by showing that machines embodying the invention were sold before the critical dates in violation of 35 U.S.C. § 102(b), but Plaintiffs failed to meet or support their burden of proof that the machines charged by Defendants to violate the statute were "ex-

perimental" within the meaning and intent of Section 102(b).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and the parties in this action under Title 28 United States Code Sections 1338 and Title 35 United States Code section 281. Venue is properly laid in this District, Title 28 United States Code Section 1400.

2. For the purposes of this litigation, Plaintiff Ajem is the owner, and Plaintiff Centri-Spray is the exclusive licensee of the patent in suit, Umbricht et al United States Letters Patent No. 2,979,-062.

3. The application for the patent in suit was filed November 9, 1954, and the critical date therefor was November 9, 1953.

4. The machines charged by Defendants to violate 35 United States Code Section 102(b) embodied the invention and were "on sale in this country" before the critical date of the application and before the critical dates of asserted Claims 4 and 16, in violation of the statute.

 5. Claims 4 and 16 asserted against the Defendants, and based by the Plaintiffs upon their originally-filed Method Claims 6, 7 and 8, later abandoned, are invalid in view of the sales by Plaintiff Centri-Spray of machines embodying the invention defined in these claims prior to their critical dates.

6. Apparatus Claims 4 and 16 are invalid under the *Muncie Gear* rule (Muncie Gear Works v. Outboard Marine and Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171) for claiming in broader terms and language, by late amendment, the horizontal transfer means that Plaintiffs had specifically limited during their earlier prosecution of the originally-filed apparatus claims to a "shuttlebar" transfer device, with an intersected sectional track.

 7. "Reduction to practice" is not essentially a necessary element involved in a violation of 35 U.S.C. Sec. 102(b) after proof of the sale without reservation for actual use more than the statutory period of one year before the application for patent therefor. In these proceedings the issue of reduction to practice is relevant only to show the purpose of a particular use or sale.

8. Even if "reduction to practice" were a prerequisite to a Section 102(b) violation, Defendants have established the burden that the patent was reduced to practice for production use by establishing that the Ford of Canada washer was shop-tested under conditions which satisfied both the plaintiff and its customer, before shipment from plaintiff's plant before the critical date as found by this Court in paragraph (12) of Findings of Fact (supra).

 9. Defendants are entitled to judgment declaring that United States Letters Patent No. 2,979,062 is invalid and void, and not infringed by Defendants.

10. Defendants are entitled to their costs and disbursements, with costs against Plaintiffs.

11. Defendants are entitled to recover from Plaintiffs their reasonable attorneys' fees incurred in the defense of this action and the prosecution of their counterclaim.