CARDINAL OF ADRIAN, INC.,
Plaintiff,

v.

PEERLESS WOOD PRODUCTS,
INC., et al., Defendants.

Civ. A. No. 29897.

United States District Court,
E. D. Michigan, S. D.

June 15, 1973.

Richard D. Grauer, Bernard J. Cantor, Daniel G. Cullen, Detroit, Mich., for plaintiff.

Thomas P. Mahoney, Donald M. Cislo, Santa Monica, Cal., C. Robert Wartell, Detroit, Mich., for defendants.

## OPINION

RALPH M. FREEMAN, District Judge.

This is a patent infringement action in which plaintiff claims that defendants are infringing Claims 1–4 of U. S. Patent No. 3,205,532 entitled "Latchless Door Hinge" issued on September 14, 1965, and Claims 2–5 of U. S. Patent No. 3,212,124 entitled "Hinge for Latchless Door", issued on October 14, 1965. The patents involve latchless, self-closing hinges, now widely used on kitchen cabinets in place of the previously used conventional hinge and separate friction or magnetic latch.

Plaintiff, Cardinal of Adrian, Inc., is a Michigan corporation. It is the owner of the two patents-in-suit by assignment from its president, the patentee, Robert D. MacDonald. Defendant, Peerless Wood Products, Inc., is a Michigan corporation in the business of manufacturing kitchen cabinets. Defendants, Ajax Hardware Manufacturing Corporation and Ajax Hardware Corporation (hereinafter referred to as "Ajax") are California corporations. Defendant, Peerless, the original defendant, utilizes the accused hinges which it purchases from defendant Ajax, the latter having voluntarily entered the case as co-defendant in May of 1970. Jurisdiction and venue are admitted, being based upon 28 U.S.C. §§ 1337, 1338, 1400, 2101 and 2202 and also upon the voluntary appearance of defendant Ajax. Written notice of infringement was given to defendant Ajax on October 21, 1965, pursuant to 35 U.S.C. § 287.

In addition to the usual defenses of non-infringement and invalidity due to obviousness, defendants also claim that the '124 patent is unenforceable due to alleged fraud on the Patent Office, a defective oath and misuse, and that both patents are unenforceable because of late claiming. These defenses are also affirmatively asserted by the way of counterclaim seeking declaratory judgment of patent invalidity and asserting violation of the antitrust laws.

During the trial the Court had the opportunity to examine numerous physical hinges received in evidence, including those manufactured by plaintiff, several of plaintiff's licensees and defendant Ajax. The Court also observed demonstrations of assembled kitchen cabinets equipped with such hinges and studied working models of other hinges which defendants had built pursuant to the disclosures of certain prior art patents. Plaintiff has chosen claim 1 of the '124 and claim 4 of the '532 as representative claims of each patent. Thus only these two claims have been considered by the Court.

## SUBJECT MATTER

The two patents-in-suit concern a door hinge containing a self-closing mechanism which eliminates the need for a separate latch. The hinge creates a door-closing force whenever the door is within about 30 degrees of its closed position. In all open positions outside such 30 degree self-closing zone, a slight snubbing force is created which tends to hold the door at any position. Even in the fully closed position, a closing force, called "overclosing", is continuously generated to assure full closing and to eliminate any bounce-back when the door is slammed. This continuous closing force eliminates the need for a separate latch, since the hinge itself is self-latching or self-holding as well as self-closing.

Briefly stated, these functions are accomplished in plaintiff's hinges by a spring-loaded pressure member held by one leaf of the hinge which continuously bears upon a wraparound or knuckle of the other leaf during relative movement of the two leaves. In the open positions, the pressure member acts radially against an arcuate portion of the wraparound so that the force is directed radi-

ally through the hinge pin axis. Since the force is directed axially or radially, it has a zero length lever arm and the door is merely snubbed or held in any open position. During movement of the door toward its closed position, the pressure member rides along such arcuate surface, exerting a constant snubbing force, without any closing force until it reaches a terminal edge of the wraparound, known as a recess or notch. As the pressure member rides over the edge of the wraparound, at about the 30-degree open position, it drops partially into such recess, and acts against the edge of the wraparound. The direction of the force shifts away from the axially directed radial force to a laterally directed force which is tangential to the hinge pin. The shifting of the direction of the force away from the hinge pin axis creates a lever arm, thereby producing a turning force to close the door. Even in the fully closed position, the pressure member continues to act tangentially against the edge of the wraparound to maintain the door in its closed position.

The two patents-in-suit illustrate two commercial versions of plaintiff's self-closing hinges. The first commercial version was the hinge illustrated in the '124 patent. Cardinal manufactured the '124 hinge for only one customer, Merillat Woodworking Company. It was first sold to Merillat in February of 1962 and its sale was discontinued about a year later when Merillat switched to Cardinal's second commercial self-closing hinge model.

Cardinal's second self-closing hinge model was the 1130 hinge, one of three models of the 1100 series. The 1130 was first sold in February of 1963. The mechanism in all of the 1100 hinges was identical, the only difference among the hinges being in the shape of the door leaf to accommodate bevel, inset or right angle door edges.

Another Cardinal hinge utilizing the same concept as the 1100 series hinge was the 1212 model first sold in August of 1963 to defendant Peerless. The virtually identical self-closing mechanisms of the 1100 and 1212 hinges illustrate one of the great values of the '532 hinge: its universality of application, not only to the three 1100 hinge models, but also to the entirely different style of the 1212 hinge. The 1212 hinge is the hinge illustrated in the '532 patent-in-suit.

The 1212 hinge was sold to Peerless for a period of three years when Peerless switched to the accused Ajax hinge. The 1212 hinge was not sold in significant quantity to anyone else. Cardinal's 1100 series hinges have been in continuous and substantial production since February 1963. It is significant that representative Claim 1-in-suit of the '532 patent covers not only the 1212 hinge illustrated in that patent, but also the unillustrated 1100 hinges. For that matter, representative Claim 4 of the '124 patent covers the conventional style 1212 and 1100 hinges as well as the plunger type hinge of the '124 patent.

## VALIDITY

■ The patentability of a device depends upon three factors: utility, novelty, and non-obviousness. 35 U.S.C. §§ 101, 102 and 103; Graham v. John Deere Co., 383 U.S. 1, 12, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Defendants do not question the utility of the patent and in light of the evidence produced at trial, such a contention this court finds would be without merit. As to the second element, novelty, defendants claim that the plaintiff's patents are anticipated by prior art which would negate novelty. We note that defendants did not specifically set forth this claim in the pre-trial order presented to this court; nor was the issue of anticipation included in the section on issues to be litigated. Nonetheless we shall dispose of this issue. Defendants also claim that the patents-in-suit are invalid because they are obvious. In addition, the defendants assert invalidity on a number of technical grounds which we will discuss later in this opinion.

We note before proceeding further that the parties apparently agree that the pertinent and relevant art to be viewed in determining the validity of the patents-in-suit is the hinge art. Plaintiff's expert witness, George Shampo, agreed with this premise when cross-examined by the defendants during rebuttal.

In discussing those issues relating to the validity of this patent we must keep in mind that a patent is presumed valid and that the burden of establishing the invalidity of the patent or the claim is upon the party asserting it. 35 U.S.C. § 282.

■ As noted above, a finding of anticipation negatives novelty, an essential element of a valid patent. Defendants claim that the '124 patent is anticipated by the prior art patents of Rotter patent no. 2,522,897 and Smith patent no. 1,122,322. The '124 patent lists both the Rotter and Smith patents as references considered by the patent examiner. Moreover, defendants claim that the '124 and the '532 patents are so similar that if there is anticipation of the '124 by Rotter and Smith, these same patents must anticipate the '532. Thus disposition of the '124 patent will dispose of the '532 as to this issue as well. In addition, however, defendants claim that the '532 patent is anticipated by the Hiscock patent, no. 2,208,158.

■ The test for the determination of anticipation is set forth in the case of Allied Wheel Products v. Rude, 206 F.2d 752, 760 (6th Cir. 1953) where the court said:

> To anticipate an invention is to negative novelty; but even though a patent is not anticipated, and is concededly novel, it may lack invention. In order to anticipate an invention, it is necessary that all of the elements of the invention or their equivalents be found in one single description or structure, where they do substantially the same work in substantially the same way.

■ Defendants' expert, Mr. Fischer, testified that the '124 patent was anticipated by Rotter and Smith. The Rotter patent is labeled as "a protective cover for telescopic sight lenses", its purpose being to provide a cover which closes tightly over the sight thus keeping out moisture and dirt, while permitting the cover to be opened easily and held out of the way of the lens. This is accomplished by a rounded surface, a recess and a spring means. The patent also describes an edge at Column 3, lines 12 and 13. Rotter is self-closing like the MacDonald hinge and maintains a tightly closed position similar to MacDonald's overclosing. Although it shows the holding of the cover in the open position by the pressure of the spring against the rounded surface, the patent does not show radial snubbing for intermediate positions of the cover. In addition Rotter does not show flanges or leaves of a hinge. The mechanism does not suggest incorporation into a hinge for any other purpose. For these reasons, we find that Rotter does not contain all of the elements of the '124 patent or their equivalents; nor does it perform substantially the same work in substantially the same way.

Smith discloses a three-position hinge such as is conventionally used for a pantry-kitchen or bar room swinging door. This hinge holds the door by utilizing a pressure member in the frame leaf which acts against flats provided on the door leaf. Engagement of the flat-faced pressure member with any one of the flats holds the door in the corresponding position. Defendants' expert admitted that Smith did not show overclosing. Thus Smith fails to meet the test for anticipation inasmuch as it fails to do substantially the same work in substantially the same way. In addition this patent fails to show the pressure member-engaged arcuate surface which results in a radially directed snubbing force in all open positions, as required by Claim 4 of the '124 patent. Thus Smith fails to anticipate the '124 patent.

Defendants' argument that Smith and Rotter anticipated the '532 patent depended upon a finding that these patents anticipated the '124. The court agrees with defendants but finds that Rotter and Smith do not anticipate the '532 for the reasons stated above.

Secondly, defendants claim that the '532 patent is anticipated by Hiscock, patent no. 2,208,158. That patent shows a construction to be used on a lid of a box for the purpose of holding the lid or top of the box in the open or closed position. Hiscock shows knuckles, an arcuate surface, a recess, an edge, and a spring means. The drawings do not show a hinge pin and a reading of the specification and claims does not mention the concept of a hinge pin. That patent does not disclose self-closing as a feature. Nor does the patent disclose over-closing. Page two, Column 1, lines 69–74 discuss the relationship of the spring and the recess. Contrary to the testimony of Mr. Fischer, this language indicates that the recess merely "serves to effectively seat the spring when the cover is in closed position." Thus although many of the elements of the '532 are present in Hiscock, nonetheless Hiscock lacks a hinge pin, not to mention the lack of leaves, and fails to perform substantially the same work in substantially the same way.

We note that defendants at times have argued that whatever elements of the MacDonald patents might be missing in Rotter, Smith, or Hiscock could be found in other art. However, as stated in the quote from *Allied Wheel, supra,* set forth in defendants' brief, anticipation requires that all of the elements of MacDonald's patents be found in one single description or structure. Thus it would not be proper to find anticipation by using more than one prior art patent, none of which alone contained all the elements of the claimed invention.

Thus we find that the claims-in-suit are not anticipated and, therefore, do not lack novelty.

Next we must determine whether the mechanism of the patent would be obvious to one skilled in the art in light of the prior art. In Graham v. John Deere, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966), the Supreme Court set forth the inquiries which this court must make to determine obviousness under § 103.

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

As previously stated, the hinge art is the relevant art to be considered.

Defendants, upon whom the burden of proof rests, rely upon four patents in asserting that the '124 patent is obvious, Smith, U.S. Patent 1,122,322 (1914), Rotter, U.S. Patent 2,522,897 (1947), Streeter, U.S. Patent 403,494 (1889), and an Italian patent, 531,951 (1955). Defendants' expert emphasized Smith and the Italian patents in discussing obviousness. Each of these four patents is listed as a reference in the '124 patent. Despite defendants' argument that the examiner may not have fully reviewed Smith, we find that the presumption of validity remains with the '124 patent since there is no proof that the examiner did not fully consider Smith.

The Smith patent, as previously discussed, discloses a hinge for a swinging door. The hinge is composed of two elements, one containing a pressure member, the other containing a projection with a number of flats. The door will rest at any point where the pressure

member engages a flat. However, we note that Smith shows no overclosing. Nor does the patent suggest radial snubbing action in all open positions as provided in the '124. In short, Smith does not suggest the kind of function obtained in the '124 which provides for tightly closing a door and holding it closed while permitting it to remain in any open position.

The Italian patent has substantially the same construction as Smith and thus suffers from the same deficiencies noted above.

The Streeter patent is cited by defendants solely for its overclosing feature which the plaintiff concedes that the patent shows. However, in other respects the patent is different from the '124. It, like Smith, provides for a swinging door. It has a pressure member and spring on one portion of the hinge which rides on a cam surface contained on the second portion. There is no arcuate surface or radial snubbing suggested in the patent. Moreover, the hinge pin or pintle floats because the door attached to the cam surface moves in and away from the pressure member. The hinge also has a tendency to fly open as well as self-close. In operation it does not suggest the smooth working action of the '124 patent.

The Rotter patent as discussed before is not a hinge for a door or a shutter, but for a self-closing cover on any kind or telescopic sight. Thus those aspects of Rotter which are similar to the '124 do not constitute a part of a hinge. There are no flanges or hinge leaves in the Rotter patent which consists of a spring pressing against a ball-type pressure member which in turn rides on an opposite surface which contains an arcuate portion, an edge and a flat. The flat is placed at an angle so as to produce over-closing in the closed position. Although Rotter contains many of the elements of the '124, it does not teach the concept of radial snubbing in any open position. The thrust of the patent is to hold the cover fully open and fully closed.

■ Defendants attack the '532 patent as being obvious in light of three patents: Gustafson, U.S. Patent 1,279,814 (1921), Hiscock, U.S. Patent 2,208,158 (1940), and Hizsa, U.S. Patent 2,872,697 (1959). Gustafson and Hiscock were cited by the patent examiner in the '532 patent as references; Hizsa was not cited. This of course weakens the presumption of validity if the Hizsa patent is found to be pertinent.

The Gustafson patent shows a butt-type hinge which incorporates a flat cantilevered leaf spring, secured at one end to one hinge leaf. The spring extends perpendicularly to the hinge pin axis, and its free end bears against a contoured portion of the hinge pin which is exposed by an opening in the other hinge leaf. This spring never acts upon any portion of the wraparound of the opposite leaf and there is no coaction between such elements as in the '532 patent. In other words the chief difference between the Gustafson hinge and the '532 hinge as freely admitted by defendants, is that the spring in Gustafson acts against the hinge pin instead of the knuckle. This, of course, reduces the amount of leverage produced by the spring and lessens the closing force of the hinge. In addition the spring acts directly upon the hinge pin instead of having an intervening pressure member as required in the '532. Gustafson also has no overclosing since the spring merely falls into the slot. Additionally there does not appear to be radial snubbing.

The Hiscock patent which was discussed earlier in connection with anticipation does not disclose self-closing nor over-closing. It also lacks other features as discussed previously.

The Hizsa patent involves an ordinary hinge to which has been added on one leaf of the hinge one or more leaf springs which operate against knuckles of the opposite hinge leaf. It is entitled

"friction-braked hinge assemblies". The patent shows how to brake the movement of the hinge. However, it does not show *radial* snubbing as shown in the '532 and it has no reference to the self-closing or over-closing of the MacDonald hinge. It does not appear to be proper as a reference since its only extra feature, that of merely braking the movement of a hinge, is not contained in the MacDonald patent.

Thus no single prior patent contains all of the functions performed by the '124 or '532 patents, namely, self-closing, over-closing and radial snubbing. Secondly the only patents showing a pressure member against something other than the hinge pin and showing over-closing, self-closing and radial snubbing do not show a separate hinge. (Rotter and Hiscock)

The court finds that the '124 claim calls for a new combination of a separate hinge having mounting flanges, ears or knuckles and a hinge pin, combined with a mechanism wherein a spring and pressure member carried by one hinge leaf acts against a knuckle of the opposite leaf, first against an arcuate portion for all open positions and then against an edge in the near-closed and closed position, to produce the radial snubbing, self-closing and over-closing functions. No hinge of the prior art has such structure, and no prior art hinge is capable of performing all of those functions.

The court further finds that the '532 claim calls for a new combination and coaction of two groups of elements. The first group defines a conventional hinge of two plates, three sleeves and a hinge pin. The second group defines a novel self-closing, snubbing and over-closing mechanism comprised of a spring means having its ends held by one hinge leaf and a pressure member on its central portion which bears against the central sleeve of the other hinge leaf, such central sleeve being arcuate and having a terminal edge formed by a notch or recess in the sleeve. The mechanism produces a radial snubbing force in all open positions, and a tangential closing and over-closing force in the near-closed and closed positions. The prior art fails to show such a mechanism, nor does it show such mechanism coacting and combined with a conventional hinge to provide the stated functions while retaining the advantages of the conventional hinge.

We come then to the most important question, namely, was this combination of elements obvious in early 1962 to one skilled in the art. Or to paraphrase the court in Parker Sweeper Co. v. E. T. Rugg Co., 474 F.2d 950 (6th Cir. 1973), given that the state of the art included all of these patents, could a skillful hingemaker setting out to design a self-closing, self-latching radial snubbing hinge accomplish his mission without adding any "invention" to the art.

The testimony of hinge experts Wald and Dargene established the level of ordinary skill of workers in the hinge art. In Wald's words:

> They are familiar with mechanisms generally. They know a spring ball detent, they know torsion bars, they know hinging devices, they know camming devices and followers for same; they are familiar with the general kind of mechanical devices. And as such, they can use those mechanical devices in solutions to their problems.

Dargene testified that prior to the MacDonald inventions, the functions and operating principles of cams, followers and latches, such as involved in this lawsuit, were familiar to him and were within the general knowledge of workers in the mechanical art. Wald testified of the long felt need of the cabinet industry for such a hinge. More importantly he discussed earlier attempts to satisfy the need. Despite the prior art that was available, only MacDonald put the combination of elements together.

From all the evidence this court concludes that the combination of elements in the '124 and the '532 patents was not obvious to those skilled in the art in

1962 and for that reason we hold that these patents meet the statutory tests of novelty, utility and non-obviousness.

We note that this conclusion was bolstered by extensive proof at trial of the tremendous commercial success of the hinges of plaintiff and of the great acceptance of the hinge by many of those manufacturers who produce cabinets requiring hinges and latches.

## FALSE OATH IN '124

Secondly, defendants assert that the patents are invalid due to certain defects in the file wrapper. Defendants argue that a statement made in the oath attached to the continuation application for the '124 patent is false and that therefore the patent must be held invalid. The oath, signed and sworn to by Mr. MacDonald on October 8, 1964, contains the statement that he did not know and did not believe that the invention was "in public use or on sale in the United States for more than one year prior to this application; . . ." As shown by the defendants and admitted by the plaintiff, the plunger hinge, depicted in the drawings of the patent, had been sold more than one year prior to the date of the oath. In reply to defendants' argument that such an incorrect statement should render the patent invalid, plaintiff argues that because the oath in question was a part of a continuation application the oath should be read in light of the filing date of the original application in 1962.

Defendants rely upon the case of A. H. Emery Company v. Marcan Products Corporation, 389 F.2d 11 (2d Cir. 1968), in which the patentee had filed an oath which stated that the invention was not in public use or on sale for more than one year prior to the application which was not true. The district court found that the inventor had not read the oath before signing it and was not aware of the contents. The district court held that such conduct was negligent but not fraudulent, and would not therefore vitiate the patent. The court of appeals affirmed the district court's exercise of

its equitable powers. However, the court of appeals noted that the court could have denied relief to the patentee because of his careless behavior since the patent office heavily relies upon the oath of the patentee.

Defendants also cite the case of United States v. Saf-T-Boom Corp., 164 USPQ 283 (D.C.Ark.1970), affirmed per curiam 431 F.2d 737 (8th Cir. 1970). The court in that case found that the patent was issued as a result of the filing of an affidavit which was false in part and upon which the patent office relied. The inventor in that case had also made a false statement as to prior public use. The court held that such a statement in the context of that case constituted fraud upon the patent office.

In the case of Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), the dismissal of an infringement suit brought by the assignee of the patentee was affirmed where the court found that the assignee knew or had reason to believe that the patentee had stated falsely that he was the sole inventor and had given incorrect dates as to the conception of the invention, the disclosure, etc.

In each of these cases cited by the defendants the oath in question had been filed with the original application. In the case at bar we are dealing with an oath filed with a continuation application.

In the case of Holmes v. Thew Shovel Co., 305 F.Supp. 139 (N.D.Ohio 1969), the court was faced with the identical problem before the court in the case at bar. The inventor in a continuation application made an incorrect statement as to prior sales of the invention. The court in that case found that the error was inadvertent and therefore did not constitute fraud on the patent office. In addition the court stated that even if the error was not inadvertent, the error was insignificant since the statute does not require that an oath be made as to prior sales.

It is true that the patent statutes do not require that an oath as to prior public use or sale be made by the inventor. Section 111 provides that the applicant shall file in writing an oath in compliance with Section 115 of Title 35. Section 115 provides that the inventor shall make an oath stating that he is the original and first inventor and stating his country of citizenship. Only in the rules of the patent office found at 37 CFR does the requirement appear. Thus 37 CFR § 1.65 states

> In every *original* application the applicant must distinctly state that . . . the invention has not been in public use or on sale in the United States more than one year prior to his application . . .

The rules of the patent office seem to require a supplemental oath only when new matter is added to the application. In *Holmes* the court found that an additional oath is not required in a continuation application since by definition no new matter is contained therein. The court in *Holmes* went on to say that since the inaccurate oath was superfluous, it was difficult to find that the oath prejudiced the entire proceedings before the patent office. See also Aerosol Research Co. v. Scovill Manufacturing Co., 334 F.2d 751, 756 (7th Cir. 1964) and Locklin v. Switzer Brothers, 299 F.2d 160, 167 (9th Cir. 1961).

In the case at bar the oath itself appears to be a form in which the name of the inventor was inserted and which the inventor signed at the bottom in the designated space. The print is small and the lines are single spaced. Although there is no testimony directly on this issue, it appears that in such a case the affiant, Mr. MacDonald, may not have realized all that was contained in the document. But more importantly, since the oath was a part of a continuation application, it was superfluous. Moreover, it is the date of the filing of the original application which is important in determining public use or sale. We are not convinced that the patent of-fice relied upon this oath or the portion in question. For these reasons we do not find that the incorrect statement in the oath of Mr. MacDonald constitutes fraud on the patent office.

## FRAUD IN '124

Thirdly, defendants assert that Mac-Donald, the inventor and patent applicant, committed a fraud upon the patent office when he filed an affidavit dated May 21, 1965 during the prosecution of the continuation application in the '124 patent. Defendants point to a passage in the affidavit which they claim to be false and misleading. In that passage, MacDonald stated that Bildwel Company was manufacturing hinges "similar in design and functionally identical to those of Figs. 1–4 of the drawings" in the application.

The drawings, Figs. 1–4 of the '124 patent, admittedly are of the plastic plunger hinge. It was first sold in February of 1962 and was admittedly unsuccessful; sales of the hinge ended in February of 1963. But the hinges referred to in the affidavit were admitted to be the 1100 and 1212 hinges. These hinges were first sold in early 1963 and the 1100 became a great commercial success. Defendants claim that the language quoted above was untrue and misled the examiner because a) the 1100 and 1212 hinges are not similar in design and functionally identical to the plunger hinge depicted in the drawings, and b) the plunger hinge was not a commercial success.

The Supreme Court has held that inequitable conduct on the part of the patentee in procuring his patent can be raised as a defense to an infringement suit. See Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Inequitable conduct includes the withholding of material data and the furnishing of false, material data to the patent office with the intent to deceive and which, in fact, misleads the patent office. See Monsanto Co. v. Rohm and Haas Co., 312 F.

Supp. 778, 791 (E.D.Pa.1970), aff'd 456 F.2d 592 (3d Cir. 1972); Kolene Corp. v. Motor City Metal Treating, Inc., 307 F.Supp. 1251 (E.D.Mich.1969), aff'd 440 F.2d 77 (6th Cir. 1971); Norton v. Curtiss, 433 F.2d 779, 57 CCPA 1384 (1970).

■ Defendants point to the testimony of the inventor, Mr. MacDonald, where he stated that there are differences in design between the plunger hinge and the 1100 hinge. They also rely upon the testimony of their expert Mr. Fischer to the same effect. But as pointed out by plaintiff, the fact that there are differences between two objects does not prevent a conclusion that the two objects are nonetheless similar. This court finds that the plunger hinge and the "1100 series" hinge are similar in design and that such a conclusion placed in an affidavit is not false or misleading.

As to the identity of function, Shampo, plaintiff's expert, testified that the three hinges, the plunger hinge, the 1100 hinge and the 1212 hinge, were functionally identical. Even Mr. Fischer, defendants' expert, stated that many of the same functions are found in all three hinges, although he refused to acknowledge the correctness of MacDonald's statement. The court is therefore satisfied that the affidavit correctly stated that the hinges being manufactured were "functionally identical" in the sense that all three hinge models function to hold the door in all open positions by radial snubbing, to self-close the door from the near-closed position, and to apply an overclosing force to assure full closing and eliminate bounce.

Moreover we note that Mr. Gutchess, the patent attorney who prosecuted the MacDonald '124 patent, testified that on June 10, 1965, he had an interview with the patent examiner at which time he showed the examiner a cabinet with 1100 hinges attached. In addition, in a response to the patent office dated June 15, 1965 which is included in the file wrapper of the continuation application

to the '124 patent, at p. 42, Mr. Gutchess stated:

> Applicant's attorney appreciates the interview courteously granted by the Examiner June 10. In this interview, a number of hinges were shown to the Examiner and a cabinet *embodying applicant's hinges was displayed and discussed.* (p. 45 of the file wrapper; emphasis added)

We find these circumstances to be inconsistent with any intention to mislead the examiner as to which hinge was referred to in the later affidavit. Thus we find no intention on the part of Mr. MacDonald to deceive the patent office. We also find no evidence that the Examiner was deceived by the affidavit of MacDonald dated May 21, 1965, filed during the prosecution of the continuation application in the '124 patent.

### LATE CLAIMING

Defendants also attack the validity of both patents-in-suit, the '124 and the '532 on the basis that each patent involves late claiming. The application for the '124 patent was filed June 20, 1962 and in the original specification a portion of the invention was described as follows:

> "The spring 76 extends into a plunger 78 which is located in the guide passage 62 . . ." (p. 5 of the file wrapper)

Subsequently, on July 7, 1964, while the application was still pending an amendment was made to the application resulting in the elimination of the term "plunger" from the above description and substituting the term "pressure member." (See original file wrapper at pp. 43–44) Shortly thereafter the parent application of the '124 patent was placed under final rejection. The applicant chose not to pursue that application and instead filed a continuation application on October 12, 1964. This continuation application used the same drawings as the original application and the same specification with one exception: A comparison of line 12, page 5 of the original file wrapper, cited above, with

line 54, Col. 2 of the specification of the patent as allowed or with page 5, line 28 of the continuation file wrapper, which is entitled specification, reveals that in that one place alone in the specification the applicant deviated from the original specification by adding after the term "plunger" the phrase "or pressure member." Although the term "plunger" was used throughout the specification, the term "pressure member" was added only once. In the claims that followed, the term "pressure member" was used in some (see claim 1, p. 12 of the file wrapper) while "plunger" was still used in others (see claim 7, p. 19 of the file wrapper). In June of 1965 additional claims were added to the '124 application including a claim 14 which became claim 4 of the patent. That claim utilized the term "pressure member."

As discussed in connection with other issues in this case, the plunger hinge, which is shown in the drawings of the '124, was first sold in February of 1962 and was phased out in February of 1963 at which time the plaintiff or its predecessor began manufacturing the 1100 hinge and later the 1212 series of hinges. These hinges are quite different in their outward appearance from the plunger hinge. Defendant maintains that but for the addition of the term "pressure member" in July of 1964, the claims of the '124 patent as they then were written, would not have covered the 1100 series of hinges; in other words the term "plunger" did not describe the 1100 series hinges. Therefore, defendants argue the addition of the term "pressure member" constituted a broadening of the invention and constituted an addition of new matter to the application. Because this amendment was made more than one year after the first sale of the 1100 series of hinges in February of 1963 and because the 1100 series of hinges is claimed to be covered by this additional language, defendants charge that the language change resulted in late claiming.

The contention of the defendants as to the '532 patent is similar. The '532 patent was filed on November 5, 1962. Its drawings are embodied in the 1212 hinge. The specification of the '532 application described one portion of the invention as a "spring rod". (See p. 5 of file wrapper, line 11). In the claims accompanying the application the term "spring rod means" is used to describe the device (e. g. Claim 1, p. 13 of the file wrapper). Subsequently on July 10, 1964, while this application was still pending, the applicant filed an amendment substituting the term "spring means" for "spring rod" or "spring rod means." (See file wrapper at p. 32) We note that this amendment was made three days after the amendment was made to the '124 patent.

As discussed above the defendants maintain that this amendment broadened the patent application and constituted new matter. According to defendants, the 1100 series of hinges was not covered by the old claims using the term "spring rod means", but is covered by the amended term "spring means". Accepting this hypothesis, the result of this broadening would be late claiming because the broadened term covered the 1100 series which had been sold more than one year prior to the amendment. The patent was ultimately issued with the term "spring means" in Claims 1, 2 and 3.

■ Thus there are two issues to be determined by the court as to the defense of late claiming. The first is whether or not the amendments made to each patent application broadened the patent so that it covered additional inventions, i. e., contained new matter; and second, whether the amendments constituted the first disclosure of the device known as the 1100 hinge. The mere broadening of a patent is not improper unless it claims an invention that has been for sale or in the public domain for more than one year prior to the first disclosure of such invention to the patent office. 35 U.S.C. § 102. This was the holding in Muncie Gear Works, Inc. v. Outboard Marine & Manufacturing

# 1310

Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942).

In that case, the patentee of an outboard motor amended his patent to include a description of the surfaces of his device and to emphasize an anti-cavitation plate rather than an anti-torque plate. However, in that case the outboard motors embodying these principles had been sold for more than two years * prior to the amendments. The court stated at p. 768, 62 S.Ct. at p. 869,

> The claims in question are invalid if there was public use, or sale, of the device which they are claimed to cover, more than two years * before the first disclosure thereof to the Patent Office . . . [The patent statute] would in terms provide for their invalidity had they been offered by application rather than by amendment; and whatever may be the efficacy of an amendment as a substitute for an application, it surely can effect no more than the application itself.

In the case at bar it is clear that the amendments or changes in question in July of 1964 were made more than one year after the first sale of the 1100 hinges in February of 1963. Thus, if the 1100 hinge was not disclosed until the amendments, the patents are invalid for claiming an invention after one year of public sale or use.

Thus the court must determine whether the term "pressure member" in the '124 patent and the term "spring means" in the '532 patent were disclosed in the drawings, specifications or claims of the original application. Acme Highway Products Corp. v. D. S. Brown Co., 431 F.2d 1074 (6th Cir. 1970).

In determining whether a term broadens the patent, courts have treated the question as one of fact. In Application of Robert J. Anderson, 471 F.2d 1237 (CCPA 1973), the court found that an amendment of the claim which changed the description from "containing a medicant" to "carrying a medicant", did not broaden the claim and thus did not add new matter.

In National Latex Products Co. v. Sun Rubber Co., 274 F.2d 224 (6th Cir. 1959) the invention was a molding process. An amendment to the application described the interior of the mold as being "non-porous". The amendment was attacked as new matter because the material of the mold had not been disclosed. The court disagreed inasmuch as the original drawing of the application had cross-hatching on the sketch of the mold indicating that it was to be made out of metal and because the court found "metal" and "non-porous" to be nearly synonymous. Therefore, the amendment did not introduce new matter and was not invalid under that theory.

In a case strikingly similar to the case at bar, Ajem Laboratories, Inc. v. C. M. Ladd Co., 301 F.Supp. 1390 (E.D.Mich. 1969), aff'd 424 F.2d 1124 (6th Cir. 1970), the court found that an amendment changing the language of the claims from "horizontal shuttle-bar transfer mechanism" to "transfer means" introduced new matter. Since machines embodying the new language had been sold more than one year prior to the amendment, the claims involved were held invalid for late claiming. The claims in the patent, thus, went from a specific kind of transfer means to all kinds of transfer means.

In the case at bar the two claims in suit were amended to substitute general descriptive terms, "Pressure member" in the '124, and "spring means" in the '532, for more specific terms, "Plunger" and "spring rod" or "spring rod means". Plaintiff argues that a plunger is a pressure member and that a plunger, a form of pressure member, was shown in the drawings, and that therefore a pressure member was disclosed in the original application. However, this court does not find that a drawing of a plunger, admittedly a type

* The statute at that time allowed two years of public use prior to application. The present statute permits only one year. 35 U.S.C. § 102.

of pressure member, is sufficient to disclose the concept of using any kind of pressure member. Thus we do not find that the pressure member of the 1100 series which involves a different form of spring and a different pressure member to be disclosed by a drawing encompassing a plunger and find plaintiff's argument to be erroneous. The change of "plunger" to "pressure member" parallels the kind of amendment found to constitute new matter in the *Ajem* case. Since we have also found that the pressure member of the 1100 hinge was not disclosed by the term "plunger" and since the 1100 hinge was sold more than one year prior to the amendment, the amendments and the continuation application constituted late claiming. Thus claim 4 of the '124 patent, the representative claim-in-suit, is invalid for late claiming.

In the '532 patent this court finds that the same kind of amendment was made, namely, one which broadened the patent and disclosed new matter for the first time. In fact plaintiff's own expert on direct examination stated that spring means was broader than spring rod. The term "spring rod" or "spring rod means" disclosed a rod type of spring and would cover any type of rod spring, as testified to by defendants' expert, Mr. Fischer. But the term "spring means" would cover coil springs, leaf springs, and rod springs. Thus in light of *Ajem* and in light of the obvious broadening of the claim, the court finds that the amendment incorporated new matter into the patent.

■■■ Although we find that the term "spring means" introduced new matter, we do not find that the 1100 hinge was first disclosed by that language. We find that the spring of the 1100 hinge was disclosed by the original term "spring rod" or "spring rod means." Examination of the 1100 hinge shows a spring that can only be described as a spring rod. It may be of a different configuration, but it is nonetheless a rod type of spring. Thus, although the amendment added new matter, there is

no proof that the applicant claimed the new matter too late.

We find that as to claim 1 of the '532 patent, the claim-in-suit, it is not invalid for late claiming although reliance on the term "spring means" in claim 1 may only go back to the date of the amendment of July 10, 1964.

## INFRINGEMENT

Next we will discuss plaintiff's claim of infringement. We will discuss both patent claims even though we have held the '124 claim invalid for late claiming.

Defendants assert the doctrine of file wrapper estoppel in response to the charges of infringement. They argue that statements made during prosecution of the patent applications should limit plaintiff to a plunger form of pressure member in the '124 patent and to a spring rod form of spring means in the '532. This allegation must be determined before the claim of infringement can be decided.

■■■ We first note that this doctrine is only applicable when infringement is shown by application of the doctrine of equivalents. Kolene Corp. v. Motor City Metal Treating, Inc., 440 F.2d 77 (6th Cir. 1971). But regardless of the basis for finding infringement in this case, we will discuss this issue.

■■■ We find defendants' argument on this issue to be without merit. None of the cases cited by defendants deal with this precise situation. Furthermore, the majority of comments by the applicant upon which defendants rely, were made in connection with claims that were rejected or cancelled. The remaining remarks of applicant made in the June 15, 1965 amendments to the '124 and in the July 10, 1964 amendments to the '532 in no way indicate a limitation on the terminology. Mr. Fischer, defendants' expert, was unable to explain to the court how the amendatory remarks indicated that major reliance was placed upon a spring rod rather than spring means in obtaining the allowance of claims. As stated in Top-Scor Products, Inc. v. H. C. Fischer Co.,

257 F.Supp. 775 (N.D.Ohio 1966) at p. 777, a patent must be construed in light of its history in the Patent Office. An applicant is bound not only by his claims that were allowed, but by the representations he made to the patent office distinguishing his invention from the prior art and discussing the novelty of his invention, in order to secure allowance of the patent claims.

In the case at bar we do not find that any statements pointed out by defendants in the file wrapper histories of these patents, limiting the '124 to a plunger or the '532 to a spring rod, had anything to do with the allowance of the claims-in-suit. This argument is rejected.

Therefore, we are left with the issue of infringement of plaintiff's patents by defendants' device.

The evidence is clear and undisputed that, like MacDonald's '532 hinge, the accused Ajax hinge incorporates in a conventional looking, conventionally fabricated and mounted cabinet hinge the overclosing, radial snubbing in all open positions and self-closing features of the MacDonald hinge, and that these functions are accomplished by a pressure member on one leaf which acts radially against the arcuate portion of a wraparound on the other leaf and then tangentially against the edge of that wraparound.

The only areas of disputed testimony regarding infringement concern the Ajax hinge pin construction and the specific mounting and holding arrangement of the Ajax pressure member. The Ajax hinge pin is actually in the form of two separate half-length pins, inserted from opposite ends, and of course, lined up end-to-end. Both representative claims-in-suit call for "a hinge pin" which pivotally connects the two hinge leaves.

Ajax seems to contend that, in addition to the function of providing the necessary pivotal connection, its two half-pin construction results in certain *additional* functions or features. How-ever, the issue here is only whether the accused hinge has the structure and function called for by the claim, not whether there is any improvement or additional function. The court is satisfied from the record that the Ajax hinge pin construction falls within the language of the claim.

Ajax further contends that infringement is avoided because its spring is not held *directly* by one of the hinge leaves, but rather by an additional intermediate "carrier" element.

The Ajax carrier together with the spring and pressure member forms an initial sub-assembly which is subsequently assembled to one of the hinge leaves and hinge pin at final assembly. According to defendants' own witnesses, the Ajax pressure member is located on the intermediate portion of the spring, and the ends of the spring are held by the carrier. They further admitted that the Ajax carrier moves with the door leaf, i. e., the hinge leaf opposite the one with the arcuate surface and edge, as required by the claims.

The Ajax argument is that the carrier element is held by the hinge pin, and not by the door leaf, and therefore infringement is avoided. The fact is that the carrier is held both by the hinge pin (which passes through holes in the carrier) and by the door leaf, which has a carrier-receiving opening into which the carrier is inserted. This dual holding is essentially no different than in the MacDonald hinges, where the spring is held by a hinge leaf which in turn is also and necessarily held by the hinge pin. In Ajax, the door leaf is, in effect, fragmented to form a separate carrier, which then is held by the hinge pin as well as by its connection to the door leaf. The testimony establishes that the Ajax carrier becomes "part of the door leaf" and is "integrated" with the door leaf and that such relationship is necessary or the Ajax hinge would not work, as admitted by Fischer.

Thus, the court finds that the Ajax use of a separate carrier element, rather than an integral carrier portion of the

leaf, does not avoid the claims-in-suit. Zysset v. Popeil Brothers, Inc., 276 F.2d 354 (7th Cir. 1960). The Ajax spring is "carried by" the Ajax carrier, which is in turn "carried by" the Ajax door leaf, as required by the '124 Claim. Similarly, the Ajax spring has its "end portions held by" the carrier, which in turn is "held by" the Ajax door leaf, as required by the '532 Claim.

The court finds that the Ajax hinge Model 591 utilizes the combination of elements called for by both claims-in-suit, and that the Ajax hinge performs all of the claimed functions and in the same manner as called for by the claims.

Thus, this court finds that the '124 patent and the '532 patent are literally infringed by the accused, Ajax device. However, even if the patents are not literally infringed, the court would find infringement nonetheless under the doctrine of equivalents.

As to the allegations of patent misuse and violation of the anti-trust laws, we reject defendants' argument inasmuch as we have found that the patents are not invalid for obviousness and that no fraud was practiced upon the patent office. Moreover, contrary to the position of the defendants, we find no indication in the record that plaintiff did not analyze the defendants' product to determine whether Amerock was correct in claiming infringement. As the court views the record in this case, there is no evidence to support these defenses of misuse and violation of the anti-trust laws. These defenses are found to be without merit.

Thus this court holds that the '124 patent claim is invalid for late claiming but that the '532 patent claim is valid and infringed.

An appropriate order shall be submitted. Additional proposed findings of fact and conclusions of law may be submitted if necessary to effectuate this decision. The trial of this case will be resumed at an early date to determine damages unless this issue is resolved otherwise by the parties.